**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JESSE JAMES MCGHEE,**

     **Plaintiff,**

**v.**                             **Case No.: 2:14-cv-17811**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for child's insurance benefits, a period of disability and disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's motion and brief requesting judgment on the pleadings, and the Commissioner's brief in support of her decision, which seeks judgment in her favor. (ECF Nos. 11, 12, 13).

The undersigned has fully considered the evidence and the arguments of counsel.

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On October 29, 2010, Plaintiff Jesse James McGhee ("Claimant"), filed applications for child's insurance benefits, DIB, and SSI, alleging a disability onset date of June 28, 2009, (Tr. at 199-206, 222-228), due to "severe vertigo, unable to walk." (Tr. at 234). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 12). Claimant then filed a request for an administrative hearing, which was held on January 14, 2013, before the Honorable William R. Paxton, Administrative Law Judge ("ALJ"). (Tr. at 26-52). By written decision dated January 24, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-24). The ALJ's decision became the final decision of the Commissioner on April 10, 2014, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Motion and Brief in Support of Judgment on the Pleadings, (ECF No. 11, 12), and the Commissioner filed a responsive Brief in Support of Defendant's Decision, (ECF No. 13). Consequently, the matter is thoroughly briefed and ready for resolution.

## II.   Claimant's Background

Claimant was just shy of 22 years old at the time of the alleged disability onset, 23 years old when he filed the instant applications for benefits, and 25 years old on the date of the ALJ's decision. (Tr. at 14). Claimant has a high school education and communicates in English. (Tr. at 33, 233). He has no past relevant work. (Tr. at 22).

## III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as preliminary matters that Claimant met the insured status for disability insurance benefits through September 30, 2010, (Tr. at 14, Finding No. 1), and was younger than 22 on the alleged disability onset date of June 28, 2009. (Tr. at 14, Finding No. 2). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since he purportedly became disabled. (Tr. at 14, Finding No. 3). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments:

"pseudoseizures, syncope orthostatic hypotension, tachycardia, hypertension, obesity, degenerative disc disease of the thoracic and lumbar spine, and chronic obstructive pulmonary disease (COPD)." (Tr. at 15-16, Finding No. 4). The ALJ also considered Claimant's other alleged impairments, including migraine headaches, gastroesophageal reflux disease ("GERD"), and anxiety, but found that these impairments were non-severe, because they did not cause a significant limitation in Claimant's ability to perform basic work activities. (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-17, Finding No. 5). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he could never perform climbing of ladders, ropes, and scaffolds and could occasionally perform climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. He would have to avoid concentrated exposure to vibrations, fumes, odors, dusts, gases, and poor ventilation, and all exposure to hazards such as heights and machinery.

(Tr. at 17-22, Finding No. 6). At the fourth step, the ALJ noted that Claimant had no past relevant work. (Tr. at 22, Finding No. 7). Under the fifth and final inquiry, the ALJ reviewed Claimant's age, education, transferability of job skills, in combination with his RFC, to determine his ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 8-11). The ALJ considered that (1) Claimant was born in 1987, and was defined as a younger individual age 18-49; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant had no past relevant work. (Tr. at 22, Finding Nos. 8-10). Given these factors, Claimant's RFC, and relying on the testimony of a vocational expert, the ALJ

determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 22-23, Finding No. 11), including work as an information clerk, non-emergency dispatcher, and bench worker. (Tr. at 23). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 23, Finding No. 12).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts one challenge to the Commissioner's decision; that being, that the ALJ erred when he improperly discredited Claimant's statements regarding the persistence, intensity, and limiting effects of his symptoms. (ECF No. 12 at 7-11). Claimant argues that the ALJ failed to follow the mandates of Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (1996), as well as the relevant Social Security regulations, when he focused almost entirely on the objective medical information to assess Claimant's credibility and disregarded the evidence of Claimant's limited daily activities. (*Id.* at 9-10).

In response, the Commissioner maintains that the ALJ fully complied with the regulations and SSR 96-7p by evaluating Claimant's credibility under the approved two-step process. According to the Commissioner, the ALJ clearly considered all of the evidence and provided a detailed explanation for his conclusion that Claimant's descriptions of the limiting effects of his symptoms were not supported by the evidence. (ECF No. 13). As such, the Commissioner insists that the ALJ's credibility finding was supported by substantial evidence. (*Id.*)

## V.    Relevant Medical Evidence

The undersigned has reviewed all of the medical evidence in the record and summarizes the most significant information as follows.

### A.  Treatment Records

On June 25, 2009, Claimant was admitted to Charleston Area Medical Center, Inc. ("CAMC") by the hospital's Medicine Clinic for complaints of severe dizziness. (Tr. at 554-59). Claimant reported that, a few nights earlier, he had developed a severe headache and, while walking to his mother's room to tell her, he had a syncopal episode. He could not recall any symptoms prior to the episode, but woke up on the dining room floor. Upon awakening, Claimant had mild confusion. Claimant went to Thomas Memorial Hospital where he had an MRI study, which showed fluid in his ear. (Tr. at 555). He was given Valium and prednisone, and was discharged. Dr. Young, the attending physician at CAMC, performed a physical examination and a neurological examination of Claimant, both of which were unremarkable. Dr. Young suspected that Claimant had positional vertigo, but decided to evaluate him further to rule out labyrinthitis. He ordered a MRI and MRA and a 2D echocardiogram. The Ears, Nose, and Throat ("ENT") service was also consulted.

The following day, Claimant was treated with Antivert. When he later complained of chest pain, a nitroglycerin tablet was given, but did not relieve the pain. Therefore, his chest pain was thought to be caused by anxiety. When all of the studies were completed, and the laboratory reports were returned, Dr. Young noted that they were all normal. He diagnosed Claimant with vertigo versus labyrinthitis and referred him to Dr. Charles Crigger, an ENT specialist, for evaluation. Claimant was instructed to take his medications and participate in activities as tolerated. (Tr. at 556).

On July 7, 2009, Claimant was brought to the Emergency Department ("ED") at CAMC by ambulance, accompanied by his mother. (Tr. at 544-53).  He complained of persistent dizziness and associated nausea. According to his mother, Claimant had

experienced vertigo for some time and had been worked up at several hospitals, including Thomas Memorial Hospital and CAMC. A previous neurological examination showed no clearcut abnormalities, and his medical imaging had been normal. Claimant was given a prescription for Antivert, but Claimant's mother insisted that it did not relieve his symptoms. (Tr. at 546). Dr. Adkins, the ED physician, performed a physical examination and neurological examination of Claimant, which were both negative. (Tr. at 548). Dr. Adkins, concluded that Claimant had vertigo with moderate ataxia and suspected from history that Claimant might have Bell's palsy. Claimant was admitted to the hospital under the care of the Medicine Service for further assessment. (Tr. at 549). A CT scan of the head was performed and was interpreted as normal. Claimant was ultimately discharged after having a favorable hospital course. (Tr. at 544). He was referred for follow-up with Dr. Crigger. (Tr. at 545).

On July 12, 2009, Claimant returned to CAMC's ED with the chief complaint of dizziness. (Tr. at 594-96). Claimant indicated that he had just been discharged from CAMC, but continued to experience headache and a vertigo-type sensation that left him feeling unbalanced. He reported using Antivert without benefit. Claimant's physical examination, laboratory studies, and EKG were all normal. (Tr. at 595-96). He was given Valium and Zofran for his symptoms and was discharged with instructions to return to the Medicine Clinic and to keep an ENT appointment that had been made for him. (Tr. at 596). However, the following day, July 13, 2009, Claimant was admitted to CAMC for further evaluation of his syncope. (Tr. at 535-42). Claimant stated that for the past two weeks, he "[kept] passing out," and had passed out five times that day. (Tr. at 536). A variety of tests were performed, including an EKG and a CT scan of the head, both of which were normal. (Tr. at 538, 542). After conducting an extensive work-up, the

8

treating physicians concluded that there was no medical cause that could be identified for Claimant's reported symptoms. (Tr. at 535). Claimant was told that the medical team had no further options to offer him and suggested that he be evaluated by a behavioral medicine specialist. Claimant became upset with the suggestion and ultimately left the hospital against medical advice ("AMA"). *(Id.*).

Claimant returned to CAMC's ED on July 16, 2009, stating that he continued to have dizziness and black-outs. (Tr. at 577-79). The ED physician, Dr. Payne, documented Claimant's recent admission and AMA discharge. Nonetheless, Claimant's mother had decided to bring him back to the hospital, because he had two episodes of "passing out" that day. He was out for five minutes each time, and awoke somewhat groggy and confused. However, Claimant's mother confirmed that he had no seizure-like symptoms. Claimant also complained of having a headache for four days, which felt like a pressure-type pain in the bilateral temporal areas. When asked about his syncopal episodes, he denied any exacerbating or alleviating factors. In addition, Claimant's mother confirmed that an ENT evaluation was negative. (Tr. at 580). Claimant's physical examination by Dr. Payne revealed no abnormal findings. (Tr. at 578). Dr. Payne ordered a Medicine Service consultation performed by a resident physician, Dr. Clark. (Tr. at 580-81). Dr. Clark explained in his note that Claimant had left the hospital AMA on July 15, 2009 after Dr. Singh, the attending physician, suggested that Claimant had a psychosomatic/conversion disorder and needed to see behavioral medicine for assessment. Dr. Clark spoke with another physician from the Service, who indicated that the attending physicians were confident that Claimant had no organic cause for his symptoms. Dr. Clark examined Claimant and found nothing abnormal. He documented his belief that Claimant needed to be examined by a behavioral medicine specialist. (Tr.

at 582). In view of Claimant's headaches, he was given Toradol and Reglan in the ED and was discharged in stable condition. His diagnoses were syncope, vertigo, and GERD. (*Id.*).

Claimant returned to CAMC's ED on July 20, 2009, complaining of extreme dizziness. (Tr. at 572-74). He arrived by ambulance and was accompanied by family members. Claimant described persistent intractable vertiginous symptoms that affected his balance and caused him to fall frequently. He also had intermittent headaches and extreme nausea. Claimant reported taking Valium and Antivert in the past, with no relief of symptoms. The ED physician, Dr. Kwei, documented Claimant's prior negative evaluations by a neurologist and an ENT specialist. Dr. Kwei performed a physical examination of Claimant, which was negative, and ordered an EKG, which showed sinus tachycardia. A CT scan of the head was normal. (Tr. at 574). Dr. Kwei felt that Claimant should be assessed by the Medicine Clinic. He decided to order some intravenous medications to provide short-term relief of Claimant's intractable vertigo. (Tr. at 573).

On July 22, 2009, Claimant presented to CAMC's ED with complaints of frequent syncopal episodes. (Tr. at 436-38). He stated that the episodes occurred when he was standing, sitting, or in any position. He indicated that along with syncope, he also had vertigo and some shortness of breath. The treating resident physician, Dr. Josh Haddox, noted that Claimant had been seen on several occasions and had undergone an extensive evaluation, which included telemetry and both CT and MRI scans of his brain. (Tr. at 436). Dr. Haddox confirmed that a MRA of Claimant's head and a MRI of his brain, which were completed at CAMC on June 26, 2009, were normal, as was Claimant's EKG. (Tr. at 530-31). Claimant had no family history of coronary artery disease. (Tr. at 437). Dr. Haddox could find no obvious cause for Claimant's complaints,

10

but suggested that he might have neurocardiogenic syncope. Dr. Haddox discharged Claimant in stable condition with a prescription for Lopressor and planned to schedule Claimant for a 24-hour holter monitor study.  On July 28, 2009, Claimant underwent the 24-hour holter monitor study. (Tr. at 433). However, no abnormal heart rhythms were detected.

Claimant went to CAMC's Medicine Clinic on October 12, 2009 for follow-up. (Tr. at 560-61). He complained of the room "spinning all of the time." (*Id.*). According to Claimant, the dizziness got better or worse without any predictability. After conducting a physical examination, the resident physician noted that the cause of Claimant's dizziness was still in question. He planned to assist Claimant in obtaining a medical card, so that he could see a neurologist.

Claimant presented to CAMC's ED on November 27, 2009, again complaining of being dizzy and passing out. (Tr. at 562-66). He reported that his symptoms increased with standing and walking, although he had not had an episode of syncope for approximately a month until the day of admission, when he passed out "a couple of times." (Tr. at 562). His mother told Dr. Wright, the ED physician, that when Claimant passed out, he was usually unconscious for 2-5 minutes and would be confused upon awakening. However, he did not appear to have seizure-like symptoms at the time of the episodes and was never incontinent. Claimant added that after a syncopal episode, he always had a global headache. Dr. Wright noted that Claimant's prior brain scans had been normal, his ENT evaluation was negative, and his cardiologist had no explanation for his symptoms. Claimant's physical examination by Dr. Wright was unremarkable, although he did have an episode of tachycardia while being monitored in the ED. Dr. Wright ultimately discharged Claimant with instructions to follow-up in the Medicine

11

Clinic. (Tr. at 564). He indicated that Claimant's syncope still had an unknown etiology; however, Dr. Wright felt Claimant might have some sort of cardiac dysrhythmias triggering the syncope. A Medicine Service resident who saw Claimant in consultation in the ED also noted that prior work-ups seeking the cause of Claimant's symptoms had been negative. He again suggested that Claimant might need a referral to behavioral medicine, and he planned to discuss this recommendation with Dr. Singh, the attending physician at the Medicine Clinic. (Tr. at 566).

On February 13, 2010, Claimant underwent a stress echocardiogram/EKG. (Tr. at 467). The EKG revealed a normal heart rhythm. The echocardiogram demonstrated normal left ventricular function and wall motion. Bi-ventricular systolic function was also within normal limits. (Tr. at 468). A second holter monitor study reflected underlying sinus rhythm with rare premature ventricular and supraventricular ectopy. (Tr. at 471). A CTA of the chest was additionally performed to evaluate Claimant's reports of shortness of breath. (Tr. at 518-19). The films showed no abnormal findings. (Tr. at 519).

Claimant again sought care at CAMC's ED on May 5, 2010 for chest palpitations and pain. (Tr. at 623-25). Dr. O'Hara, the attending physician, noted that Claimant had a history of "multiple somatic complaints revolving around vertigo, dysequilibrium, chest pain and palpitations, and syncope." (Tr. at 623). He developed a sharp pain in his left upper chest the day before presenting that persisted as a dull ache. Claimant also had a history of waking with tachycardia, and this symptom was being controlled with beta blockers. However, Claimant had experienced a rapid, forceful heartbeat for two days, which he felt was different than his morning tachycardia. Dr. O'Hara's physical examination of Claimant was unremarkable, and laboratory studies were normal.

Claimant was diagnosed with chest wall pain and was given Ativan and Xanax. He was discharged with instructions to follow-up with the Medicine Clinic; preferably, in the next 48 hours. (Tr. at 625).

Claimant presented to Familycare on May 10, 2010 to establish primary care. (Tr. at 523). He described his current complaints as "heart palpitations, chest pain, dizziness, tachycardia, anxiety, falling down." (*Id.*). He indicated that his problems with vertigo had started in June 2009, and indicated that he had been evaluated at CAMC six times for his recurrent syncope. A physical examination was performed by Dr. James Blackwell, who noted no abnormal findings. Claimant was referred for a cardiology evaluation.

On May 25, 2010, Claimant was assessed by Dr. Joseph DeVono, a cardiologist practicing in South Charleston, West Virginia. (Tr. at 480-81). Claimant complained of having approximately 15-20 episodes of syncope in the past year. He also experienced chest pain, radiating to his neck. After conducting a physical examination that revealed normal findings, Dr. DeVono decided to schedule Claimant for a diagnostic catheterization. (Tr. at 481). On June 3, 2010, Claimant was admitted to CAMC by Dr. DeVono for evaluation of chest pain and multiple syncopal episodes. (Tr. at 476-77). Claimant reiterated having 15 to 20 different syncopal episodes in the prior year, stating that he could not remember anything one minute prior to passing out and would be out three to four minutes each time. (Tr. at 476). He denied seizure-like activity, but described intermittent chest pain over the prior six months that felt like stabbing, aching, or someone sitting on his chest. Claimant indicated that he had already been evaluated neurologically, and the testing was normal. Dr. DeVono's physical examination of Claimant was within normal limits. Accordingly, Dr. DeVono proceeded

with the diagnostic cardiac catheterization. He planned to transfer Claimant to the Cleveland Clinic for further evaluation following the procedure. (Tr. at 477). Claimant had a left heart catheterization, selective coronary angiography, and left ventriculogram. (Tr. at 474-75). The test results were normal. Dr. DeVono referred Claimant to Dr. Ronald McCowan, a local cardiologist, for further evaluation of Claimant's syncope. (Tr. at 492).

Claimant's next medical examination was on June 10, 2010 at Familycare. (Tr. at 525). He reported having undergone a cardiac catheterization by Dr. DeVono, which was negative. He stated that he had been referred to the Cleveland Clinic, but had been unable to get an appointment. Claimant reported no changes in his condition. Dr. Blackwell performed a physical examination that was unremarkable. Claimant was instructed to return in six weeks for follow-up. (*Id.*). When Claimant returned, his symptoms were the same, and his examination revealed no new findings. (Tr. at 527).

Claimant's first office visit with Dr. McCowan occurred on August 25, 2010. (Tr. at 492-93). Claimant told Dr. McCowan that his symptoms included palpitations, hypertension, and orthostatic hypotension. He stated that his syncopal episodes lasted around five minutes and when he woke up, he felt very lethargic, weak, and disoriented. However, a stress echocardiogram had been negative for ischemia and showed an ejection fraction of 50-55%. An echocardiogram and diagnostic cardiac catheterization were likewise negative. Consequently, Dr. McCowan arranged for Claimant to enroll in a 30-day transtelephonic arrhythmia monitoring study from August 25 through September 26, 2010. (Tr. at 506-17). At the conclusion of the study, Dr. McCowan's preliminary findings included premature ventricular contractions, narrow complex tachycardia, and sinus tachycardia. (Tr. at 506).

14

On October 27, 2010, Claimant presented to Dr. McCowan's office for follow-up and was seen by Marcus Epps, Certified Physician's Assistant. (Tr. at 494). Claimant reported having daily chest pain, accompanied by shortness of breath, lightheadedness, dizziness, with tachypalpitations. He also indicated that he had experienced one episode of syncope since his last visit. On this date, Claimant's examination was normal. Mr. Epps documented that Claimant's recent monitoring had shown primarily sinus tachycardia. Mr. Epps increased Claimant's medication and referred him to Dr. Assal for possible electrophysiological studies ("EPS").

Claimant was seen at Familycare on November 23, 2010 for a DHHR physical. He was examined and assessed by Dr. Blackwell, who listed Claimant's active problems as hypertension, orthostatic hypotension, tachycardia, syncope, low back pain, GERD, COPD, and anxiety. (Tr, at 528-29). Claimant's physical examination was unremarkable except for his weight, which was 289 pounds. His active problems were assessed as unchanged at the end of the examination, and Claimant was told to return in three months, or sooner if his symptoms increased or he developed additional concerns. (Tr. at 529).

On December 2, 2010, Claimant was evaluated at CAMC's ED for chest pain lasting three to four days. (Tr. at 619-21). He described the pain as left-sided and sharp, which came and went. Claimant reported seeing Dr. DeVono and Dr. McCowan. He stated that although he had been told that he had "known issues with his heart," no one could tell him exactly what was wrong. His physical examination was normal, as were his laboratory studies and medical imaging. Claimant was told that he could be admitted for further evaluation of his symptoms, but he declined and asked to be discharged. (Tr. at 620).

On January 28, 2011, Claimant returned to Dr. McCowan's office for follow-up. (Tr. at 486-87). In the interim, Claimant had undergone a tilt table test that was positive for a dropping heart rate. Claimant reported that he had not had a syncopal episode for approximately one month. (Tr. at 486). His main complaint on the day of the visit was palpitations especially when laying down to sleep at night. Claimant stated that the palpitations were associated with anxiety. Dr. McCowan ordered an EKG, which was normal. Claimant's physical examination was also normal. Dr. McCowan diagnosed sinus tachycardia, with no specific etiology, and vasovagal syncope. (*Id.*). He educated Claimant about the need for lifestyle modifications to reduce the syncope, and switched Claimant's medication from Metoprolol to Cardizem. (Tr. at 487).

On April 26, 2011, Claimant presented to Dr. DeVono's office for follow-up. (Tr. at 649). He complained of mid-sternal chest pain that did not radiate. The duration of the pain varied, and on rare occasions was accompanied by shortness of breath. Claimant also had heart palpitations when standing or lying down, and the duration of the palpitations varied. He had one syncopal episode in the prior month that was unwitnessed, and had no nausea, vomiting or shortness of breath related to the episode. Claimant stated that his activity level was reduced. He also mentioned that he had night sweats. Claimant was scheduled for an EP evaluation by Dr. McCowan to occur the following week. Claimant's physical examination was normal. (Tr. at 650). Dr. DeVono diagnosed Claimant with syncope, orthostasis, and GERD. He advised Claimant to return in one year. (*Id.*).

Claimant presented to Dr. McCowan's office on May 10, 2011 for follow-up. (Tr. at 488-89). Claimant reported that Cardizem "did not work at all," so he returned to using Metoprolol. (Tr. at 488). He complained of daily heart palpitations with

associated chest pressure, lightheadedness, dizziness, and shortness of breath. The episodes were not related to exertion. Claimant also described having one syncopal episode in the past month, but did not receive treatment. He stated that he was walking up the stairs at the time of the episode, but after the event, he could not recall walking up the stairs. Claimant's physical examination was normal, as was his neurological examination. Dr. McCowan again educated Claimant regarding vasovagal syncope and suggested he alter his lifestyle to reduce the symptoms. (Tr. at 489). For example, Claimant was instructed to ensure hydration, liberalize salt intake, and assume a recumbent position when symptoms began. Dr. McCowan did not believe the episodes were consistent with arrhythmogenic syncope, but recommended implantation of a loop recorder to rule out arrhythmia as a cause of the syncope. Claimant declined the recorder. (*Id.*). Dr. McCowan also suggested that Claimant have a full neurological evaluation.

On July 5, 2011, Claimant visited Familycare to request a referral to a neurologist. (Tr. at 680). He stated that he continued to have syncopal episodes and headaches, and had recently been evaluated by Dr. McCowan, who suggested that he see a neurologist. Claimant's physical examination was normal. Dr. Blackwell agreed to refer Claimant to a neurologist for further evaluation. (*Id.*).

Dr. Joby Joseph, a neurologist, saw Claimant on August 11, 2011 in follow-up to an earlier consultation. (Tr. at 646-48). Dr. Joseph indicated that Claimant had not experienced any new episodes since his last consult. His MRI and EEG examinations had been read as normal. On this date, Claimant's physical and neurological examinations remained within normal limits. Dr. Joseph diagnosed Claimant with syncope and collapse, but did not believe Claimant had seizures. He planned to continue

17

Claimant on his existing treatment and told him to return if he had additional symptoms or concerns. (Tr. at 646).

On January 5, 2012, Claimant was evaluated by Dr. Brett Faulkner at the West Virginia University ("WVU") Outpatient Electrophysiology Clinic. (Tr. at 716-17). Claimant reported that he had been taking Midodrine, which helped with his syncopal episodes. Although he had become lightheaded and dizzy on two occasions, he had not passed out. Claimant had also tried taking a prescription of Zoloft, but stopped the medication after two weeks because it made him feel "tingly." (*Id.*). Claimant's physical examination was normal, except that his mood and affect were decreased. An EKG was normal. Dr. Faulkner diagnosed Claimant with orthostatic hypotension and possible orthostatic tachycardia syndrome. (Tr. at 717). He planned to keep Claimant on his current medications and encouraged Claimant to maintain a high salt diet, to aggressively hydrate, and to start wearing TED (compression) stockings at home.

On June 21, 2012, Claimant was examined by Nancy Dunn, a nurse practitioner at Familycare. (Tr. at 684-85). Claimant had no new complaints. He was generally doing well, although he continued to have syncopal episodes without an identified cause. He reported that he was seeing a cardiologist and electrophysiologist and was told that the next step in his treatment would be insertion of a pacemaker. On examination, Claimant had a blood pressure of 126/98 and weighed 267 pounds. He was in no apparent distress, and the remaining findings were normal. Claimant's medications were renewed, and Nurse Dunn discussed with Claimant the possibility of beginning an exercise program to keep active. He was told to return in six months. (Tr. at 686).

Claimant was again seen at the WVU Electrophysiology Clinic on July 19, 2012. (Tr. at 718-20). Claimant reported that he had experienced twenty episodes of heart

palpitations since his last visit, with the longest episode lasting ten minutes. He confirmed that he had increased his salt intake and was aggressively hydrating, and overall, he felt better than he did when he first came to the Clinic. Claimant stated that he had had five syncopal episodes since January 2012. Dr. Faulkner performed a physical examination, which was normal, and ordered an EKG, which showed a normal sinus rhythm with some mild non-specific ST-T segment changes. (Tr. at 720). Dr. Faulkner concluded that Claimant had vasovagal syncope, so he discussed the pathophysiology of the condition with Claimant. Claimant was instructed to continue his medications, his high salt diet, and aggressive hydration. Claimant was seen again at the Clinic on October 18, 2012, with no major changes in his condition or treatment. (Tr. at 721-23).

Claimant returned to Familycare to see Nurse Dunn on November 15, 2012. (Tr. at 688-90).  He complained of back pain that began on November 6, 2012, and advised Nurse Dunn that he had gone to MedExpress where he was diagnosed with T11 and T12 fractures of the vertebrae. Claimant's physical examination was normal, except for the report of fractures. Nurse Dunn decided to refer Claimant to Dr. John Schmidt, a neurosurgeon, for Claimant's back issues. She told him to return in one month, or sooner if his symptoms worsened. (Tr. at 690, 704). Nurse Dunn then obtained the records from MedExpress, which confirmed that Claimant likely had some compression fractures at the T11/T12. (Tr. at 695). According to the history provided by Claimant to the physician at MedExpress, his back pain was accompanied by nausea and was not the result of an injury or accident. (Tr. at 693).

On December 10, 2012, Claimant saw Tasha Elswick, a Certified Physician's Assistant at Dr. Schmidt's office. (Tr. at 701-03). Claimant reported the sudden onset of

low back pain that had no associated triggering event. He described the pain as sharp and throbbing, rating it an eight on a ten-point scale. Claimant indicated that the pain had stayed the same since onset and was associated with bilateral posterior leg pain radiating to the knees. On examination, Claimant was noted to be 5'10" tall and weighed 260 pounds. (Tr. at 702). His coordination was intact, his gait was non-antalgic. Claimant had back pain on range of motion testing of the spine, but no pain with testing of the extremities. His strength, sensation, tone, and reflexes were all normal, as was a straight leg raising test. Ms. Elswick reviewed an x-ray taken at MedExpress, and found evidence of a questionable T11-T12 wedge compression. Additional x-rays were ordered by Ms. Elswick in light of Claimant's continued complaints. However, the x-rays showed only degenerative changes. (Tr. at 692).

Claimant saw Dr. Schmidt in follow-up on January 7, 2013. (Tr. at 748-49). Dr. Schmidt documented that he had reviewed Claimant's records from his visit with Ms. Elswick. Dr. Schmidt performed an examination of Claimant, finding no new weakness, tingling, or numbness. He felt that Claimant was neurologically stable with a possible dorsal compression fracture. (Tr. at 749). Dr. Schmidt ordered a MRI to investigate the dorsal fracture and advised Claimant to avoid dangerous physical conditions, unprotected heights, and heavy physical labor. He further instructed Claimant to return after the MRI.

On March 12, 2013, Claimant returned to Dr. Schmidt's office, still complaining of back pain. (Tr. at 737-39). He reported a recent diagnosis of rheumatoid arthritis and was waiting on the results of some additional rheumatology testing. Dr. Schmidt noted that Claimant's symptoms had not changed since their last visit. The MRI of Claimant's dorsal and lumbar spine showed degenerative changes and compression at T11 with no

canal compromise. (Tr. at 738). Dr. Schmidt concluded that Claimant had a lumbosacral strain and lumbar spondylosis. He saw no reason for surgery and instead encouraged Claimant to increase his physical activity with the help of physical therapy, heat, massage, and strengthening exercises. Dr. Schmidt felt Claimant no longer needed neurosurgery involvement and decided to refer him to a rheumatologist. (*Id.*)

### B.  Disability Evaluations and Assessments

On November 24, 2009, agency consultant, Uma Reddy, M.D., prepared a Physical Residual Functional Capacity Assessment. (Tr. at 440-47). Dr. Reddy opined that Claimant was capable of frequently lifting and carrying ten pounds, and occasionally lifting and carrying twenty pounds. He could stand and/or walk three to four hours in an eight-hour work day, could sit about six hours in an eight-hour work day, and was unlimited in his ability to push and pull. (Tr. at 441). Dr. Reddy felt that Claimant had no manipulative, communicative, or visual limitations, but he did have some postural and environmental limitations. (Tr. at 442-44). Dr. Reddy opined that Claimant could only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl and should never climb ladders, ropes, or scaffolds or balance. Claimant needed to avoid concentrated exposure to fumes, odors, dust, and poor ventilation and moderate exposure to vibrations and hazards like machinery and heights. Dr. Reddy commented that Claimant was only partially credible and would likely get better with time. (Tr. at 445). She agreed with a medical source statement on record that Claimant should not perform heavy lifting or stand for prolonged periods of time. (Tr. at 446).

On March 14, 2011, Claimant was evaluated by Dr. Alfredo Velasquez for Disability Determination Services. (Tr. at 630-32). Claimant's chief allegation was "dizziness due to rapid heart rate on and off for the last three years." (Tr. at 630).

Claimant listed his medications as a beta blocker and Zantac. He had no past medical history of surgeries or injuries. Claimant stated that he was single with no children, had a high school education, and had worked periodically as a laborer. He had last worked three years earlier. Claimant denied alcohol use, but did admit to smoking one half pack of cigarettes each day. His primary physical complaints included headaches, rapid heart rate, and acid reflux. (Tr. at 631).

Dr. Velasquez performed a physical examination, documenting that Claimant was 5 feet 10 inches tall and weighed 280 pounds. His blood pressure was 119/90; his pulse was 91; and his respirations were 18. Claimant had 20/20 vision in both eyes, with normal ocular movements. His neck, heart, lungs, and abdomen were normal. (*Id.*). Claimant's musculoskeletal and neurological examinations were also within normal limits. Dr. Velasquez diagnosed Claimant with tachycardia, etiology undetermined, but noted that Claimant was taking medication for the symptoms. (Tr. at 632).

An agency consultant, Dr. Navjeet Singh, completed a Physical Residual Functional Capacity Assessment form on April 7, 2011, in part based upon Dr. Velasquez's examination. (Tr. at 635-642). Dr. Singh opined that Claimant was capable of lifting and carrying no more than ten pounds. (Tr. at 636). Claimant could stand and walk at approximately two hours out of an eight-hour work day, and could sit for up to six hours. Claimant had unlimited ability to push and pull. With respect to postural limitations, Dr. Singh felt Claimant could climb stair and ramps, balance, stoop, kneel, crouch, and crawl occasionally, but should never climb ladders, rope, or scaffolds. (Tr. at 637). Claimant had no manipulative, visual, or communicative limitations, and his only environmental limitation was to avoid concentrated exposure to hazards, such as machinery and heights. (Tr. at 638-39). Dr. Singh confirmed that he had reviewed a

22

medical source statement regarding Claimant's physical capabilities, which opined that Claimant should avoid standing prolonged periods of time. (Tr. at 641). Dr. Singh noted that the statement was not "exacting," but he generally agreed with the conclusion. (*Id.*). Dr. Singh's assessment was affirmed on re-evaluation by Dr. Caroline Williams on July 1, 2011, although she did not feel there was sufficient evidence in the record to properly evaluate Claimant's condition for the period of June 28, 2009 through the date last insured of September 30, 2010. (Tr. at 644).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (*citing Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the

[Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   <u>Discussion</u>

Claimant argues that the ALJ erred in conducting his credibility analysis by failing to adequately consider Claimant's daily activities and persistent efforts to seek medical correction of his vertigo and syncope. According to Claimant, the ALJ breached his duty under SSR 96-7p to consider factors *other than* objective medical findings when determining the validity of Claimant's statements regarding the disabling effects of subjective symptoms.

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological

24

abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to

support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ thoroughly examined Claimant's allegations of disabling symptoms by using the two-step process required by the regulations. First, the ALJ confirmed that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 18). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Tr. at 19). The ALJ explained that although Claimant had a number of impairments, including pseudoseizures, syncope, orthostatic hypotension, tachycardia, obesity, and degenerative disc disease, the record did not support a finding that those conditions were disabling, as alleged by Claimant. The ALJ noted that despite multiple assessments by different health care providers, the objective medical evidence was "largely benign," (*Id.*), and when Claimant started taking Midodrine his symptoms decreased. (Tr. at 20). In other words, Claimant's diagnostic reports and "level of treatment" were inconsistent with the severity of symptoms alleged by Claimant. Indeed, Claimant's MRI of the brain, MRA of the head, echocardiogram, doppler study of the heart, x-rays, CT scans, multiple EKGs, and cardiac catheterization were all negative for any significant abnormal findings. In addition, Claimant was generally treated with medication and lifestyle modifications; such as, increasing his salt intake

and staying well hydrated.

The ALJ further felt that Claimant's reports of syncopal episodes to treating physicians simply were not supported by evidence in the record. (Tr. at 20-21). Most notably, Claimant described frequent syncopal episodes that were unpredictable and uncontrollable, yet he never experienced one in the presence of a health care provider. Considering the allegations, it is rather astounding that Claimant did not suffer at least one episode during his many hospital and physician visits. The ALJ specifically mentioned his disbelief of Claimant's testimony, because Claimant "minimized" his daily activities. The ALJ emphasized that Claimant admitted in his adult function reports that he frequently watched television, could perform some household chores, prepare small meals, attend medical appointments, go for rides, build computers, play games on his computer, and talk on the telephone for hours at a time. (Tr. at 21). In addition, Claimant indicated that he was capable of maintaining his finances and performing his daily grooming, and he denied needing assistance to remember appointments. He verified his ability to follow spoken and written instructions well, and confirmed that he could finish what he started. Claimant also stated that he got along well with others and was able to manage stress. In his written credibility analysis, the ALJ referenced three specific adult function reports completed by Claimant that provided a more balanced view of Claimant's daily activities than was painted by Claimant's testimony; including, a report completed in October 2009, (Tr. at 251-58), a report completed in November 2010, (Tr. at 279-86), and one completed in June 2011. (Tr. at 307-14).

After reviewing these forms, the undersigned appreciates the skepticism expressed by the ALJ in regard to the reliability of Claimant's statements. The ALJ

correctly recognized the incongruity between Claimant's descriptions of nearly constant dizziness, syncope, and collapse and his daily activities. In 2009, Claimant described his daily activities as watching television and playing on the computer. (Tr. at 251). Although Claimant asserted that he had to sit when bathing and dressing, he did not mention having any problems with shaving, shampooing, or feeding himself. (Tr. at 252). Claimant also alleged in this form that he was too dizzy to drive, pay bills, stand, or walk, but at the same time, he stated that his hobby was building computers a couple of times per month. He also indicated that he count change, handle a savings account, use a checkbook, and regularly attend physician appointments. (Tr. at 254-55). Claimant alleged that he could only pay attention twenty to thirty minutes at a time, yet he admitted to spending between three and four hours each day talking on the telephone. (Tr. at 258). Certainly, an individual with persistent dizziness and frequent syncope would experience difficulty doing such things as shaving, counting change, doing the calculations necessary to complete a checkbook, and performing tasks requiring the fine manipulation necessary to build a computer. Even playing video games would presumably be a challenge to someone with constant dizziness and feelings of being unbalanced, and that suffered from multiple syncopal episodes often in a single day.

In the 2010 form, Claimant contradicted representations made in the 2009 form by stating that he could make his own meals a few times each week, do his own laundry, and clean his room. (Tr. at 281). Also at odds with his prior adult function report, Claimant indicated that he was capable of paying bills, in addition to counting change, handling a savings account, and using a checkbook. (Tr. at 282). Although he indicated that dressing could sometimes take him "a long time," he expressed no problems with bathing, caring for his hair, shaving, using the toilet, or feeding himself. (Tr. at 280). In

this form, Claimant indicated that he could pay attention for "a long time," rather than just twenty or thirty minutes as previously stated in the 2009 form. (Tr. at 258, 284). Claimant reiterated that he played on the computer as a hobby and spoke to others on the telephone phone every day. (Tr. at 283). Claimant additionally noted, as he had in the 2009 form, that he was very good at following instructions, had no problems getting along with others, and finished what he started. (Tr. at 258, 284).

In the 2011 adult function report, Claimant now asserted that he had to have someone help him shave, (Tr. at 308), despite the fact that the medical records demonstrated no real change in Claimant's level of dizziness since 2009. He additionally contradicted his prior statements by claiming that he was incapable of preparing meals or doing any house and yard work. (Tr. at 309). According to Claimant, he was also too dizzy to pay bills or count change. However, Claimant admitted that he could still watch television and talk with his family every day. (Tr. at 311). Claimant reiterated that he could pay attention for a long time and did very well with instructions. (Tr. at 312).

In addition to the inconsistencies in Claimant's function reports, the ALJ pointed out that Claimant's statements of constant dizziness were contradicted by medical records in which Claimant denied having syncopal episodes for as long as three contiguous months. (Tr. at 18). Moreover, Claimant alleged that he needed a wheelchair to get around when he felt dizzy, (Tr. at 257, 285, 313), but as the ALJ noted, Claimant denied using any assistive devices when interviewed by Dr. Faulkner in July 2012. (Tr. at 20, 719). Despite Claimant's frequent complaints of severe dizziness, his physical examinations revealed no loss of balance or coordination. (Tr. at 20). As previously stated, the records never documented an episode of syncope while Claimant was being treated; even during inpatient evaluations that lasted several days, there were no

notations of Claimant passing out, losing his balance, or falling.

Therefore, contrary to Claimant's contention, the ALJ clearly considered Claimant's daily activities and his testimony as part of the credibility analysis. The ALJ simply concluded from the record as a whole that Claimant was exaggerating the severity of his symptoms. Substantial evidence supports the ALJ's conclusion. Claimant testified at the administrative hearing that his dizziness became so severe, he was unable to stand without passing out. (Tr. at 36). He stated that when his activity level increased—such as when he had frequent physician appointments—his symptoms would worsen. Claimant indicated that he spent 90% of the day in bed, because he suffered syncopal episodes even when he was seated. In fact, Claimant complained that he occasionally passed out when he was recumbent in his bed. Claimant testified that he had unrelenting chest pain that was exacerbated by movement and occasionally caused him to vomit. (Tr. at 39-41). He described the pain as a seven out of ten. Yet, notwithstanding Claimant's frequent medical appointments, these contentions were never verified by an eyewitness account of a single health care provider. Indeed, the notations of multiple different physicians, nurses, and physician's assistants, which were made in the record over a period of years, regularly describe Claimant as alert, oriented, and in no acute distress. (Tr. at 416, 437, 438, 477, 480, 483, 484, 486, 494, 525, 526, 528, 536, 555, 558, 560, 563, 566, 572, 578, 581, 586, 595, 613, 619, 624, 631, 650, 652, 654, 656, 659, 660, 685, 689, 694, 702, 706, 711, 716, 719, 722, 727, 730, 732, 746). With the exception of non-specific findings on a tilt table test and EKG, Claimant's objective testing was within normal limits. No definitive organic source was ever identified as the cause of his alleged symptoms. After undergoing extensive evaluations by different specialists, with no significant positive results, Dr. Singh of the CAMC Medicine Clinic,

suggested that Claimant's complaints might be psychosomatic, or have a psychological component. However, when Dr. Singh recommended that Claimant be assessed by a behavioral medicine specialist, Claimant became enraged, threatened to involve his lawyer, and ultimately left the hospital against medical advice. (Tr. at 535, 544, 580, 585). Claimant never submitted to an evaluation by a behavioral medicine specialist.

In summary, Claimant's criticism that the ALJ relied solely on objective medical findings to discount his credibility is factually incorrect. The ALJ relied, in part, on the lack of objective clinical, laboratory, radiologic, and other diagnostic findings, but he also stressed the inconsistencies in Claimant's various statements. When Claimant's testimony conflicted with his documented statements to health care providers and his adult function reports, the ALJ properly questioned the reliability of Claimant's testimony. (Tr. at 18, 43-44). Furthermore, the obvious lack of evidence corroborating Claimant's allegations of constant dizziness and frequent syncope cannot be overlooked in this case. Claimant had numerous hospital and office examinations, yet not one episode of syncope witnessed by a health care provider. Claimant asserted that when he had syncopal episodes, he would fall wherever he was standing and remain unconscious for two to five minutes. However, there is not a single record of Claimant suffering an injury in one of these falls. If Claimant truly passed out as frequently as he contended, at some point during the four documented years, Claimant should have suffered an injury. Similarly, if Claimant actually suffered unrelenting and continuous chest pain that rated a seven on a ten-point pain scale, he certainly would not have been described as being "in no acute distress" at nearly all of his physician appointments. Common sense drives the ALJ's skepticism, and the record fully supports his credibility determination.

Accordingly, the undersigned **FINDS** that the ALJ properly applied the relevant

Social Security regulations and rulings in analyzing the credibility of Claimant's statements and further **FINDS** that the ALJ's credibility finding is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 11, 12), **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir.

1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  July 10, 2015

Cheryl A. Eifert
United States Magistrate Judge

34